IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
July 18, 2017 Session

## STATE OF TENNESSEE v. JEFFREY W. TITTLE

**Appeal from the Criminal Court for Wilson County**
**No. 14-CR-550     Brody N. Kane, Judge**

_____

### No. M2016-02006-CCA-R3-CD

_____

A jury convicted the Defendant, Jeffrey W. Tittle, of attempted aggravated kidnapping and aggravated assault, Class C felonies, for grabbing the victim, placing a knife to her throat, and dragging her approximately twenty feet down a dark driveway into a scrap yard. The Defendant was sentenced to ten years for each offense, to be served consecutively. On appeal, the Defendant challenges the trial court's decision to introduce a video from the responding officer's patrol car, the trial court's decision to permit the jury to view the video more than once, and the trial court's refusal to merge the offenses based on the principles of double jeopardy and due process. We conclude that there was no error in admitting the video, that there was no error in allowing the jury to view it during deliberations, that double jeopardy principles do not bar dual convictions for attempted aggravated kidnapping and aggravated assault, and that there is no basis to disturb the determination of the jury that any removal or confinement was beyond that necessary to commit the aggravated assault. Accordingly, we affirm the trial court's judgments. We remand only for the correction of clerical errors in the judgment form.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed;**
**Case Remanded**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and TIMOTHY L. EASTER, JJ., joined.

Blake Lawrence (at trial and on appeal) and David Lawrence (at trial), Lebanon, Tennessee, for the appellant, Jeffrey Wayne Tittle.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Tom P. Thompson, Jr., District Attorney General; and Thomas H. Swink and Justin Harris, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTUAL AND PROCEDURAL HISTORY

The Defendant attacked the victim, Ms. Renee Battjes, by putting a knife to her throat and dragging her down a dark driveway toward a scrap yard. The victim managed to escape and ran toward the main road to summon help. Almost immediately after the attack, she was able to stop a law enforcement officer on patrol, and her description of the crime was recorded on video by the patrol car. Prior to trial, the Defendant sought to exclude the video and to suppress a statement he had made to police regarding his employment.[1] The trial court suppressed the statement but concluded that the video was admissible under the excited utterance exception to the rule prohibiting hearsay. *See* Tenn. R. Evid. 803(2). The video was partially muted at trial to remove a discussion between two law enforcement officers about the Defendant's prior sexual offenses.

At trial, the victim testified that on May 30, 2014, she had been walking most of the day to "clear her head" due to financial difficulties she was having with her husband. She had left her husband's vehicle around noon and had stopped by the Alcoholics Anonymous house at some point. She did not have cellular service on her telephone but had been periodically checking to see if she could use a wireless system in order to communicate with her friends or family. At approximately 8:45 p.m., the victim was tired and still a significant distance from her home. She saw the Defendant, who was a stranger to her, standing by a red truck in his driveway near the road and smoking a cigarette. The victim testified that she asked the Defendant if she could purchase a cigarette and that he responded by giving her a pack with three or four cigarettes in it. The victim had a brief conversation with the Defendant, during which she asked him who lived in the house. When he told her that his mother and grandmother lived there, she asked if his mother or grandmother could give her a ride.

The victim testified that about two or three minutes into the conversation, she began to feel uncomfortable due to the way the Defendant looked at her. She testified that the Defendant also asked her for her telephone number and if she wanted to "party" with him and his mother. The victim felt so uncomfortable that she began to note details regarding the house, including the address, a brown vehicle in the driveway, and the fact that it appeared there had been a yard sale. The victim testified that she told the Defendant that she was tired and married and that she gave him a fake telephone number before leaving. She never saw the Defendant's mother or grandmother but saw a man in a wheelchair by the door. The victim continued walking down the road past a few houses

---

[1] This statement was pertinent to a separate offense, violation of the sex offender registry, with which the Defendant was charged.

and approached a scrap yard. When she was near the scrap yard, she turned and saw the Defendant running toward her, saying that his mother would give her a ride. The victim refused and turned to keep walking.

When the victim turned around, the Defendant put one hand over her mouth and held a knife to her throat with the other hand, saying, "[Y]ou're going to listen to me now, b*tch." The Defendant then swiftly dragged her down the driveway toward the dark scrap yard. She testified that she was not good at estimating distances but thought she was dragged around twenty or twenty-five feet, about halfway to a brick wall on the premises. The victim testified she was terrified and thought her "life was over." As the Defendant dragged the victim, both fell onto the cement driveway. As a result of the fall, the Defendant's hand no longer obscured the victim's mouth, and she began to scream. She testified that her screaming appeared to "spook" the Defendant, who got up and yelled, "[S]omebody help her," before fleeing.

On cross-examination, the victim testified that she first saw the knife when it was in the Defendant's hand at her throat. She described it as "a grandpa or pocket knife" and stated, "I don't think he could have really cut me with it. I don't know, but it wasn't like a scary knife." The victim clarified that she feared for her life and that the Defendant "had me against my will." She did not know what became of the knife because she was intent on escaping after she fell.

The victim ran up the driveway and stood in the road screaming, afraid the Defendant would return. After several cars passed by, the driver of a truck told her that a police officer was coming up the road, and the patrol car stopped. The victim described herself as "freaking out," "in shock," and "scared."

Officer Derrick Way was driving on a routine patrol when he noticed cars in front of him braking for no apparent reason. He saw the victim emerge from the darkness, yelling for help, with fresh blood on her legs, arms, and hands. He described the victim as "hysterical," "frantic," "terrified," and "traumatized," noting that she was crying and talking rapidly. The victim described the crime, and police began searching for the suspect. An officer brought one suspect to the scene, but the victim told them he was not the man who had attacked her.

Detective Kirk Whitefield spoke to the victim at the roadside. The victim, whom he described as "distraught," was able to tell police the location of the Defendant's home, which was approximately two tenths of a mile up the road. The Defendant was in the yard when Detective Whitefield arrived, and the Defendant admitted to talking with the victim at his home but stated that he had been in the shower since she left. Detective Whitefield observed that the Defendant appeared to be sweating profusely, although he

claimed to be wet from a shower. The Defendant, who matched the victim's description of a man missing his top front teeth, was taken to the scene to allow the victim to identify him, which she did. The Defendant had an older scratch on one shoulder and fresh scratches down his arm. The Defendant did not have a knife when he was arrested.

The video of Officer Way's encounter with the victim was played for the jury. In the video, the victim described the crimes consistently with her testimony at trial. She was also able to give a description of the Defendant's home and of the Defendant. The victim was crying, distraught, and speaking frantically, and she repeatedly exclaimed, "Oh, my God," as she described the attack. The video included the victim's identification of the Defendant as the perpetrator and her exoneration of the first man police brought to the "show up."

Detective Whitefield acknowledged that on the video, he instructed an officer to obtain an arrest warrant only for aggravated assault because he did not believe the proof amounted to kidnapping. He explained that he made the determination less than twenty minutes after arriving on the scene and that the Defendant was charged with aggravated kidnapping after a more thorough investigation. Detective Whitefield could not remember if the victim said that the Defendant pulled her from the road or tried to pull her from the road. Detective Whitefield testified that the victim left town after the attack and that when he interviewed her more thoroughly six days later, she described being moved a distance of approximately thirty feet. He was not able to photograph her injuries until she returned to town.

The victim was treated at the scene for injuries to her leg and foot. Neither Officer Way nor Detective Whitefield noticed injuries to the victim's neck.

The victim acknowledged she was charged with vandalism in September 2014, that the charges were still pending, and that she had an outstanding warrant on a failure to appear charge related to the vandalism. She acknowledged it was possible that the prosecution had paid for her airplane ticket and motel room in order to facilitate her testimony but asserted that she had received no promises regarding prosecution on her pending charges. The parties entered a stipulation that the failure to appear charge against the victim was dismissed immediately after her testimony. The victim of the vandalism charge testified that she had no objection to the State's dismissing the vandalism charge.

Officer Way testified that he searched for the Defendant's knife that night and the next day, but that in his opinion, it would have been difficult to find the knife in the scrap yard. Detective Whitefield also unsuccessfully searched for the knife in the scrap yard.

- 4 -

Two of the Defendant's cellmates testified that he had discussed the crime in prison. Mr. Travis Bush, who had numerous felony convictions and charges, including aggravated burglary, theft, evading arrest, and drug-related convictions, testified that the Defendant told his cellmates that he was charged with an assault which had occurred in a driveway. The Defendant believed he could not be convicted if the weapon was not recovered, and he told Mr. Bush that he had thrown the knife away and that it hit a trailer. Mr. Bush testified that the Defendant had described the weapon as being "like a box cutter razor knife," but "not really like a Stanley knife, one that opens up like you cut carpet with." The Defendant stated that he held the knife against the victim's neck and that he cut himself on barbed wire while fleeing. The Defendant also told his cellmates that he took a shower after the assault and that his mother "got rid" of his clothes. After a court date, the Defendant expressed relief that the knife had not been found. The Defendant told his cellmates that the victim had been in a bar prior to the attack and that he did not believe he could be convicted of kidnapping because the offense took place in his driveway. Mr. Bush denied that the prosecution had promised him anything in exchange for his testimony.

Mr. Leonard McHardie III also shared a cell with the Defendant and had prior convictions for burglary, robbery, and drug offenses, and he was facing a current drug charge. Mr. McHardie also testified that the Defendant stated that he had picked up the victim at a bar and assaulted her with a knife. According to Mr. McHardie, the Defendant stated the victim took his money and ran away. He admitted to assaulting her with a knife and stated he hid the knife in a junk yard and then ran to his mother's house, where his mother hid his bloody clothes. Mr. McHardie testified that the Defendant also stated that he beat the victim with his fists. The Defendant had scratches on his arm from running. Mr. McHardie recalled telling Detective Whitefield that the victim came from the Alcoholics Anonymous house and had borrowed a cigarette from the Defendant. He acknowledged that Detective Whitefield had stated he would speak with Mr. McHardie's parole officer and that he hoped to "work out a deal" on a pending charge.

The defense presented the testimony of the Defendant's mother, Patricia Prock; this testimony had been taken by deposition prior to her death from cancer.[2] Ms. Prock testified that at the time of the assault, she lived with the Defendant's grandmother, the Defendant, and her other son, who was disabled. She had picked the Defendant up from work early that afternoon, and he spent the interval assisting her in moving appliances into her new apartment.

---

[2] The record reflects that "marked portions" of the deposition were read, but the appellate record contains the entire, unmarked, deposition transcript.

Ms. Prock testified that she was sitting on the porch during the Defendant's encounter with the victim but that she did not get a good look at the victim because she did not "want to look at trash." According to Ms. Prock, the Defendant came up to her and said, "Mama, this girl wants…" but she cut him off and told him, "No." Ms. Prock testified that the victim cursed and walked off, and the Defendant explained that she had wanted a ride. The Defendant then told her the victim had taken his money, but Ms. Prock told him not to pursue the matter and to go take a shower. On cross-examination, she testified that she "was the first one that took a shower" while the others packed the remaining clothing and linens. Her disabled son then began to shower directly after she did, and the Defendant began his shower in another bathroom approximately three minutes later. After everyone had showered, the Defendant took some items to the truck, and the police arrived. She explained to the police that he was wet because of the shower and not because he was sweating, but they did not believe her. Ms. Prock later testified that she had taken a shower before the victim came to the home and that the Defendant got into the shower immediately after the victim left. She also stated that the Defendant was "all scratched up" from his job building pallets. She denied that he carried a knife. Ms. Prock denied having washed the Defendant's clothes and stated that she preserved them. Ms. Prock asserted that the victim was drunk and smelled of alcohol.

The defense also introduced a report documenting the emergency care the victim received at the scene. The narrative of the report stated that the patient reported that she and her "boyfriend … had got into an altercation on a sidewalk, stating that she was grabbed from behind and the man put a knife to her throat and his other hand over her mouth." The State called the medical technician, Mr. Andrew Bell, in rebuttal. Mr. Bell acknowledged that there were errors in his report, including listing the victim's last name as "Thatches." He agreed that the narrative made it difficult to tell if the assailant was the victim's boyfriend or another man and stated he believed he would have used the word "boyfriend" rather than "man" if the assailant had been the victim's boyfriend. He testified that there was no indication that the victim was under the influence of either drugs or alcohol when he treated her. He acknowledged that his report stated that the injury was classified as "domestic violence," which meant she knew her assailant. He also acknowledged that his report did not state that the victim was dragged off the road. Officer Way was recalled and testified that the victim did not appear to be under the influence of drugs or alcohol.

The jury received instructions pursuant to *State v. White*, 362 S.W.3d 559, 580-81 (Tenn. 2012), requiring the jurors to find beyond a reasonable doubt that the removal or confinement associated with the aggravated kidnapping charge or any of its lesser included offenses exceeded that necessary to commit aggravated assault.

- 6 -

The jury convicted the Defendant of aggravated assault and of the lesser included offense of attempted aggravated kidnapping. The prosecution presented evidence at sentencing that the Defendant was a serial rapist who had committed two prior aggravated rapes and one prior aggravated sexual battery involving three separate victims. The Defendant had used a knife at the victim's throat in each of these offenses, and he had only been out of prison approximately six months when he assaulted the victim in this case. The trial court sentenced the Defendant to the maximum of ten years for each offense, to be served consecutively.

## ANALYSIS

The Defendant appeals, asserting that the trial court erred in allowing the patrol vehicle video into evidence, that the trial court erred in permitting multiple viewings of the video, and that the trial court erred in not merging the convictions pursuant to the principles of double jeopardy and due process. We conclude that the video was properly admitted and that any claim regarding permitting the jury to view it repeatedly is waived. We also conclude that there is no bar to two separate convictions for the crimes. Accordingly, we affirm the trial court's judgments.

### I. Hearsay Statements in Patrol Car Video

The Defendant argues that the patrol car video should have been excluded because it contained inadmissible hearsay. A trial court's factual findings and credibility determinations regarding a ruling on hearsay are binding on the appellate court unless the evidence preponderates against them. *Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015). This court determines de novo whether a statement qualifies as hearsay or is admissible under one of the hearsay exceptions. *Id.*

Hearsay is a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay is, in general, not admissible. Tenn. R. Evid. 802.

Under Tennessee Rule of Evidence 803(2), however, "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" is not excluded by the hearsay rule. The exception has three requirements: (1) there must be a startling event or condition that causes the stress of excitement referenced in the Rule; (2) the statement must relate to the startling event or condition; (3) and the statement must be made while the declarant was under the stress of excitement. *State v. Franklin,* 308 S.W.3d 799, 823 (Tenn. 2010); *State v. Land*, 34 S.W.3d 516, 528-29 (Tenn. Crim. App. 2000). The rationale behind the exception is that: (1) because the statement is made spontaneously in response to a startling event, there is

little opportunity for reflection or likelihood of fabrication, and (2) that the statement will accurately reflect events while they are fresh in the declarant's mind. *State v. Gordon*, 952 S.W.2d 817, 819-20 (Tenn. 1997). The statement ought to be so spontaneous that it "preclude[s] the idea of deliberation and fabrication." *State v. Smith*, 857 S.W.2d 1, 9 (Tenn. 1993).

"The startling event need not be the act that gave rise to the legal controversy." *Kendrick*, 454 S.W.3d at 478. The startling event should, however, be such that it "'suspend[s] the normal, reflective thought processes of the declarant.'" *Franklin,* 308 S.W.3d at 823 (quoting *State v. Stout,* 46 S.W.3d 689, 699 (Tenn. 2001)). "[S]tatements made in response to questions may still be admissible if the declarant is under the excitement or stress of the event." *Gordon,* 952 S.W.2d at 820-21.

The Defendant concedes that the video satisfies the first two prongs of the test: that the statement was in response to a startling event and that the statement related to that event. The Defendant disputes that the victim was under stress or excitement from the event, contending that her statements lacked "spontaneity." The Tennessee Supreme Court has explained that:

> The "ultimate test" under this prong is whether the statement suggests "spontaneity" and whether the statement has a "logical relation" to the shocking event. When "an act or declaration springs out of the transaction while the parties are still laboring under the excitement and strain of the circumstances and at a time so near it as to preclude the idea of deliberation and fabrication," this prong may be satisfied.

*Kendrick*, 454 S.W.3d at 478 (quoting *Gordon,* 952 S.W.2d at 820).

In determining if the declarant is under the stress or excitement of the startling event, the court may consider the interval between the event and the statement, the nature and seriousness of the events, and the appearance, behavior, outlook, and circumstances of the declarant. *State v. Smith*, 868 S.W.2d 561, 574 (Tenn. 1993). The declarant's circumstances include age and physical or mental condition. *Kendrick*, 454 S.W.3d at 478. The contents of the statement, which might indicate the degree of the declarant's stress, can also be considered. *Id.* The court may also consider whether the statement is made in response to an inquiry or whether it is self-serving. *Id.* at 479. The requirement that the statement be made under stress or excitement "relates most directly to the underlying rationale for the exception." *Gordon*, 952 S.W.2d at 820.

The Defendant argues that the statements were not excited utterances because they were made in response to Officer Way's questions. However "statements made in

response to questions may still be admissible if the declarant is under the excitement or stress of the event." *Id.* at 820-21. Accordingly, whether the victim's statements were prompted by questions from law enforcement is not dispositive of their admissibility. Instead, we note that the statements were made shortly after the Defendant held a knife to the victim's throat and dragged her down a dark driveway toward a scrap yard. The victim was physically very near the scene of the attack. The events were serious in nature, and the victim "thought [her] life was over." The victim was injured and described herself as "freaking out," "in shock," and "scared" because she was still worried that the Defendant might come back and continue his attack on her. She expressed concern at one point in the video that Officer Way might leave her. Officer Way described the victim as "hysterical," "frantic," "terrified," and "traumatized," and Detective Whitefield described her as "distraught." The victim was clearly under the stress of the recent attack, and the victim's description of the crime and perpetrator fall under the excited utterance exception to the rule against hearsay.

The Defendant also objects that even if some of the statements were admissible, the victim eventually calmed down and was not under stress or excitement during the later part of the video. First, we note that the video demonstrates that the victim's voice was still breaking up toward the end of the recording, indicating she was still under stress from the prior startling events. Moreover, we agree with the State that the Defendant's failure to supply the transcript from the pretrial suppression hearing hampers our review of this issue. *See State v. Richardson*, 875 S.W.2d 671, 674 (Tenn. Crim. App. 1993) (concluding that the trial court's judgments are presumed correct in the absence of a transcript); Tenn. R. App. P. 24(b) ("[T]he appellant shall have prepared a transcript of such part of the evidence or proceedings as is necessary to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal."). While the Defendant appears to argue on appeal that only a portion of the statements on the video might qualify as excited utterances, there is no showing that the Defendant sought to redact the video to restrict it to the victim's initial statements. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). On the contrary, it appears that the Defendant made a strategic decision to include the later portion of the video, which included Detective Whitefield's statement that he did not believe he had sufficient evidence to charge the Defendant with kidnapping.[3] We conclude that the Defendant is not entitled to relief.

---

[3] We note that the later parts of the video also contain the victim's identification of the Defendant and that Tennessee Rule of Evidence 803(1.1) makes admissible "[a] statement of identification of a person made after perceiving the person" so long as the declarant is subject to cross-examination at trial.

The Defendant also argues that the victim's statements should have been excluded because they were "testimonial" in nature. However, the rules prohibiting hearsay do not require an inquiry into the testimonial nature of a statement; instead, the Confrontation Clause may require the exclusion of a statement if it is testimonial and if, *in addition*, the declarant has not been subject to cross-examination. *See* U.S. Const. amend. VI; Tenn. Const. art. I, § 9; *State v. Dotson*, 450 S.W.3d 1, 63 (Tenn. 2014). Because the victim testified and was cross-examined at trial, the testimonial nature of the statement has no bearing on the admissibility of the video.

## II. Multiple Viewings of Video

The Defendant argues that the trial court erred in allowing the jury to view the video from the patrol car multiple times during its deliberation. The Defendant asserts that this was improper under Tennessee Rule of Criminal Procedure 30.1. The State responds that the issue is waived, that Rule 30.1 does not prohibit the jury from viewing an exhibit multiple times, and that the record does not demonstrate that the jury viewed the video during deliberations. We observe that, although the trial transcript does not reflect multiple viewings, defense counsel at the hearing on the motion for a new trial described leaving the courtroom to allow the jury to view the video during deliberations, and the prosecutor agreed with defense counsel's description of the events, arguing that the multiple viewings "probably helped the defense" because the jury heard Detective Whitefield's opinion that the Defendant could not be charged with kidnapping.

We nevertheless agree with the State that the issue is waived. The Defendant challenged the admissibility of the evidence based on hearsay but never objected to the video's being made an exhibit or being made available to the jury during deliberations. The video contained some material favorable to the Defendant. He cannot now premise relief upon any error in allowing the jury to view the video during deliberations. *See* Tenn. R. App. P. 36(a). We note parenthetically that under the plain language of Rule 30.1 and under relevant caselaw, the jury was entitled to view the exhibit. *See* Tenn. R. Crim. P. 30.1; *State v. Long*, 45 S.W.3d 611, 625 (Tenn. Crim. App. 2000).

## III. Double Jeopardy

The Defendant asserts that he is entitled to appellate relief because the trial court erred in not merging the aggravated assault conviction into the attempted aggravated kidnapping conviction. The Defendant's argument is that aggravated assault is a lesser included offense of aggravated kidnapping. "Whether multiple convictions violate double jeopardy is a mixed question of law and fact, which we review de novo without any presumption of correctness." *State v. Watkins,* 362 S.W.3d 530, 539 (Tenn. 2012).

The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution and article I, section 10 of the Tennessee Constitution prohibit putting the accused "in jeopardy of life or limb" twice "for the same offence." In order to ascertain if dual convictions violate double jeopardy, the appellate court must first look to the intent of the Legislature. *Watkins,* 362 S.W.3d at 556. "If the General Assembly has expressed an intent to permit multiple punishment, no further analysis will be necessary, and multiple convictions should be upheld against a double jeopardy challenge." *Id.* Only when the legislative intent is unclear does the court analyze the offenses to determine if the offenses contain the same elements. *State v. Smith*, 436 S.W.3d 751, 767 (Tenn. 2014). Because the Defendant claims that he was improperly convicted of violating multiple statutes through the "same offense," his claim falls into the category of multiple description claims. *Watkins*, 362 S.W.3d at 544. Generally, "a single wrongful act may not furnish the basis for more than one criminal prosecution." *State v. Phillips,* 924 S.W.2d 662, 665 (Tenn. 1996) (footnotes omitted). However, "[i]f each offense charged requires proof of a fact not required in proving the other, the offenses are not multiplicitous." *Id.* (footnotes omitted).

In Tennessee, multiple description double jeopardy claims are analyzed under the test described in *Blockburger v. United States*, 284 U.S. 299, 304 (1932). *Watkins*, 362 S.W.3d at 556. The *Blockburger* test involves a threshold inquiry regarding whether the violations arise from the same act or transaction. *Id.* This is determined by examining the charging instrument, statutory provisions, and whether discrete acts or multiple victims form the factual predicate of the offenses. *Id.* If this inquiry is answered in the negative, then double jeopardy is not implicated. *Id.* If the same act or transaction gives rise to multiple convictions, however, the court must determine whether the crimes constitute the same offense. *Id.* at 557. When the statutory definition of each offense includes an element not included in the other offense, then the offenses are distinct. *Id.* Indeed, "[i]f each offense includes an element that the other offense does not, 'the *Blockburger* test is satisfied, notwithstanding a substantial overlap in the proof offered to establish the crimes.'" *Id.* at 544 (quoting *Iannelli v. United States*, 420 U.S. 770, 785 n. 17 (1975)). This is because the Double Jeopardy Clause of the United States Constitution prohibits multiple punishments for the same offense, not multiple punishments for the same conduct. *Id.* On the other hand, if the elements are the same or one offense is a lesser included offense of the other, then the reviewing court presumes that multiple convictions were not intended by the Legislature. *Id.* at 557.

The offenses in this case arose from the same act or transaction: the Defendant's act of putting a knife to the victim's throat and then dragging her twenty to thirty feet down a dark driveway toward a scrap yard. Accordingly, the claim passes the threshold inquiry.

Next, we consider the statutory elements of the offenses. As charged here, aggravated kidnapping is the knowing removal or confinement of another unlawfully, so as to interfere substantially with the other's liberty, committed while the defendant is in possession of a deadly weapon or threatens the use of a deadly weapon. T.C.A. §§ 39-13-302(a); 39-13-304(a)(5). Criminal attempt requires a showing that the defendant acts with the culpability required for the offense and

> (1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;
>
> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
>
> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

*Id*. § 39-12-101(a). Conduct constitutes a substantial step only if a defendant's entire course of action is corroborative of the intent to commit the crime. *Id*. § 39-12-101(b).

The Defendant was also charged with aggravated assault by means of a deadly weapon, which required the State to show that the Defendant intentionally or knowingly caused the victim to reasonably fear imminent bodily injury and that the assault involved the use or display of a deadly weapon. *Id*. §§ 39-13-101(a)(2); 39-13-102(a)(1)(iii).

The Defendant argues that aggravated assault is a lesser included offense of aggravated kidnapping. Under Tennessee Code Annotated section 40-18-110(f), an offense is a lesser included offense of a charged offense if "[a]ll of its statutory elements are included within the statutory elements of the offense charged" or if the offense is either statutorily defined as a lesser included offense or is facilitation, attempt, or solicitation to commit the charged offense or its lesser included offenses. An offense is also a lesser included offense if it fails to meet the test that all its elements are included within the greater offense only in the respect that it contains a statutory element or elements establishing (1) a different mental state indicating a lesser kind of culpability; and/or (2) a less serious harm or risk of harm to the same person, property, or public interest. *State v. Howard*, 504 S.W.3d 260, 268, 273 (Tenn. 2016) (holding that Tennessee Code Annotated section 40-18-110 did not abrogate part (b) of *State v. Burns*, 6 S.W.3d 453, 466 (Tenn. 1999)).

- 12 -

An examination of the statutory elements of the offenses of which the Defendant was convicted leads to the conclusion that each offense requires an element not included in the other. Attempted aggravated kidnapping requires a specific intent to commit the crime of aggravated kidnapping, including a removal or confinement of the victim. T.C.A. § 39-12-101, Sentencing Comm'n Cmt. ("Subsection (a) defines three varieties of the offense of criminal attempt; all three varieties retain the traditional requirement of specific intent to commit an offense. Thus, a person must either intentionally engage in criminal acts or intend to accomplish a criminal result."); *State v. Bobby Stanley George*, No. M2012-01542-CCA-R3-CD, 2013 WL 4647626, at *9 (Tenn. Crim. App. Aug. 26, 2013) ("The nature of an attempt, then, is that it requires a specific intent." (quoting *State v. Thomas E. Bradshaw*, No. 01C01-9609-CR-00406, 1997 WL 578963, at *5 (Tenn. Crim. App. Sept. 19, 1997))). Aggravated assault, on the other hand, contains an element of fear and requires the State to show that the defendant caused the victim to reasonably fear imminent bodily injury. Accordingly, each crime contains an element that the other does not. Neither is aggravated assault a lesser included offense of attempted aggravated kidnapping under either Tennessee Code Annotated section 40-18-110(f)(2)-(4) or under part (b) of *Burns*. The offenses are not the same for the purposes of double jeopardy.

We note that despite the Defendant's claim that aggravated assault is a lesser included offense of the completed crime of aggravated kidnapping, this court has previously upheld dual convictions for aggravated assault and aggravated kidnapping. *Christopher Hubbard v. State*, No. W2014-01716-CCA-R3-PC, 2015 WL 5683092, at *9 (Tenn. Crim. App. Sept. 25, 2015) (concluding on post-conviction review that especially aggravated kidnapping and aggravated assault, both charged by means of serious bodily injury, were "two separate crimes"); *State v. Chester Dale Gibson*, No. M2005-01422-CCA-R3-CD, 2006 WL 770460, at *13 (Tenn. Crim. App. Mar. 24, 2006) (concluding, pre-*Watkins*, that especially aggravated kidnapping and aggravated assault, both premised on serious bodily injury, were separate offenses under a double jeopardy analysis because the statutes had different elements and because the defendant committed discrete acts); *State v. Evangeline Combs and Joseph D. Combs*, No. E2000-02800-CCA-R3-CD, 2002 WL 31118329, at *62-63 (Tenn. Crim. App. Sept. 25, 2002) (concluding that it was not error to refuse to include aggravated assault as a lesser included offense of especially aggravated kidnapping, both through serious bodily injury, because one required specific intent to cause injury and one was a continuing offense).

The cases cited by the Defendant for the proposition that merger is required involve the merger of aggravated robbery and aggravated assault, which both contain an element of fear. *See, e.g.*, *State v. Timothy Davale Martin*, No. M2013-00569-CCA-R3-CD, 2014 WL 1102010, at *15 (Tenn. Crim. App. Mar. 20, 2014) (concluding that offenses were the same when both were "based on the Defendant's use of a deadly weapon, against the same victim, and causing that victim to experience fear of personal

harm"); *see also State v. Felton Neville Jackson*, No. M2012-00828-CCA-R3-CD, 2013 WL 5675466, at *12 (Tenn. Crim. App. Oct. 17, 2013) (requiring merger of aggravated assault and especially aggravated robbery both charging use of a deadly weapon). These cases are accordingly inapposite. The convictions at issue do not violate the principles of double jeopardy.

## IV. Due Process

The Defendant also argues that he is entitled to reversal under *State v. White*, 362 S.W.3d 559 (Tenn. 2012). While he acknowledges that the jury was properly instructed, the Defendant argues that because he was acquitted of aggravated kidnapping, the jury found no actual removal or confinement, and therefore, no rational trier of fact could have found that the removal or confinement was beyond that necessary to accomplish the aggravated assault.

Prior to the Tennessee Supreme Court's decision in *White*, appellate courts conducted a due process review of convictions for kidnapping accompanied by another felony to determine whether the detention involved was merely incidental to the other felony. *Anthony*, 817 S.W.2d at 300. The rationale for conducting a due process review was that certain felonies frequently involved some confinement or detention, and the Tennessee Supreme Court feared that kidnapping would "overrun" these crimes. *Anthony*, 817 S.W.2d at 303 (quoting *People v. Levy,* 204 N.E.2d 842, 844 (1965)); *see State v. Alston*, 465 S.W.3d 555, 564 (Tenn. 2015) (concluding that burglary is not a crime in which detention is inherent and that the due process analysis of *White* does not apply). The *Anthony* analysis was replaced in *State v. Dixon* with a two part test analyzing whether the movement or confinement was "beyond that necessary to consummate" the accompanying felony and whether any additional movement prevented the victim from summoning help, lessened the risk of detection, or created significant danger or increased the victim's risk of harm. *State v. Dixon*, 957 S.W.2d 532, 535 (Tenn. 1997), *overruled by White*, 362 S.W.3d at 578.

In *White*, the Tennessee Supreme Court overturned the procedure utilized in the *Anthony-Dixon* line of cases. *White*, 362 S.W.3d at 578. The *White* Court concluded that the Legislature intended to punish kidnapping only when it had significance beyond any accompanying crime. *Id.* at 576-77. Accordingly, the Court dispensed with the due process analysis under *Anthony* and *Dixon* and instead concluded that due process would best be guarded by instructing the jury that it must find that the removal or confinement element of the kidnapping was in excess of that necessary to accomplish the accompanying felony. *Id.*; *see Antonio Richardson v. Ronald Colson*, No. 3:12-CV-409, 2012 WL 2721572, at *7, 8 n.4 (M.D. Tenn. July 9, 2012) (describing as "somewhat confusing" *White*'s abandonment of a separate due process analysis but imposition of

jury instructions to ensure due process, but noting that "the procedure embraced in *White* offers better due-process protections"); *see also Alston*, 465 S.W.3d at 568 (Bivens and Kirby, JJ., concurring) (concluding that the current analysis, which relies on due process, would more properly fall under the ambit of double jeopardy protections, particularly because modifications to the jury instructions have essentially added an element to the offense); *State v. Teats*, 468 S.W.3d 495, 509-10 (Tenn. 2015) (Kirby, J., concurring) (noting that *White* made only procedural modifications but that due process protections still apply to prevent kidnapping convictions when the confinement was not greater than that necessary to commit an accompanying felony).

First, we note that the jury's acquittal on the offense of aggravated kidnapping was not necessarily a finding that there was no removal or confinement. To convict of aggravated kidnapping, the jury would have had to find a knowing removal or confinement of another unlawfully, so as to interfere substantially with the other's liberty and the possession or threatened use of a deadly weapon. T.C.A. §§ 39-13-302(a); 39-13-304(a)(5). The jury could have found a failure of proof on any of these elements, not only the element of removal or confinement.

In any event, the jury was instructed that any confinement or removal in the kidnapping offenses must be beyond that necessary to accomplish the aggravated assault. Pursuant to *White*, we review the sufficiency of the evidence supporting this finding. *White*, 362 S.W.3d at 578. In reviewing the sufficiency of the evidence, "[t]he relevant question is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Pope*, 427 S.W.3d 363, 368 (Tenn. 2013); *see* Tenn. R. App. P. 13(e). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). "This Court affords the State the strongest legitimate view of the evidence presented at trial and the reasonable and legitimate inferences that may be drawn from the evidence." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012). A guilty verdict replaces the presumption of innocence with one of guilt, and on appeal, the defendant bears the burden of demonstrating that the evidence is insufficient to support the conviction. *State v. Cole*, 155 S.W.3d 885, 897 (Tenn. 2005). Accordingly, we examine whether any rational trier of fact could have found that the attempted removal or confinement was to a greater degree than that necessary to accomplish the accompanying felony. *See White*, 362 S.W.3d at 578.

In order to convict the Defendant of attempted aggravated kidnapping, the State had to establish the elements of criminal attempt as listed above. Aggravated kidnapping, as charged here, requires proof that the Defendant knowingly removed or confined the victim unlawfully, so as to interfere substantially with the victim's liberty, while in

possession of a deadly weapon or threatening the use of a deadly weapon. *Id*. §§ 39-13-302(a); 39-13-304(a)(5). A deadly weapon is "[a]nything that in the manner of its use or intended use is capable of causing death or serious bodily injury." *Id*. § 39-11-106(5)(B). A common item, such as a knife, is a deadly weapon "if the defendant in the particular case used or intended to use the item in a manner that is capable of causing death or serious bodily injury." *State v. McGouey*, 229 S.W.3d 668, 673 (Tenn. 2007); *see also State v. Eaves*, 959 S.W.2d 601, 604 (Tenn. Crim. App. 1997) (holding that a plastic pen used to stab deputy constituted a deadly weapon).

In order to convict the Defendant of aggravated assault as charged here, the State had to show that the Defendant intentionally or knowingly caused the victim to reasonably fear imminent bodily injury and that the assault involved the use or display of a deadly weapon. T.C.A. §§ 39-13-101(a)(2); 39-13-102(a)(1)(iii).

The jury was also instructed that the removal or confinement must be to a greater degree than that necessary to commit the aggravated assault, and it was instructed to consider the factors listed in *White*, including the nature and duration of the removal, whether it occurred during the commission of a separate offense and whether the separate offense inherently included a period of confinement, whether the confinement prevented the victim from summoning help, whether it reduced the Defendant's risk of detection, and whether it created a significant danger or increased the victim's risk of harm. *See White*, 362 S.W.3d at 580.

In this case, the victim testified that after she refused the Defendant's offer of a ride, he grabbed her from behind. The Defendant put one hand over her mouth, and with the other hand, he held a knife to her throat. The Defendant's cellmate described the knife as a type of box cutter or razor knife which could be flipped open and was used to cut carpet. The victim was terrified and "thought [her] life was over." This testimony supports the conclusion that the Defendant intentionally or knowingly caused the victim to reasonably fear imminent bodily injury and that the assault involved the use or display of a deadly weapon. T.C.A. §§ 39-13-101(a)(2); 39-13-102(a)(1)(iii). After placing the knife at the victim's throat, the Defendant told her, "[Y]ou're going to listen to me now, b*tch," and he began to drag her down the driveway into the darkness. The Defendant dragged the victim approximately twenty to thirty feet, keeping his hand over her mouth as she tried to scream. After he had dragged her twenty feet, they both fell, and the victim was able to scream, causing the Defendant to flee. This is sufficient to establish that the Defendant acted with the intent to complete a course of conduct that would constitute the knowing removal or confinement of the victim unlawfully, so as to interfere substantially her liberty, while in possession of a deadly weapon. Dragging the victim twenty feet with a knife at her throat was a substantial step towards committing the offense. The attempted removal would have prevented the victim from summoning

help, lessened the Defendant's risk of detection, and increased the risk of harm to the victim.

We conclude that a rational trier of fact could have found that the aggravated assault was accomplished when the Defendant put a knife to the victim's throat at the roadside and that the attempted aggravated kidnapping involved a separate attempted removal or confinement when the Defendant dragged the victim down the driveway. *See State v. Christopher Lee Williams*, No. M2016-00568-CCA-R3-CD, 2017 WL 1063480, at *5 (Tenn. Crim. App. Mar. 21, 2017) (concluding that jury could have found that confinement for aggravated kidnapping was beyond that necessary to accomplish domestic assault); *State v. Alvin Waller, Jr.*, No. W2012-02591-CCA-R3-CD, 2014 WL 1168610, at *6 (Tenn. Crim. App. Mar. 21, 2014) (concluding that aggravated kidnapping was not incidental to aggravated assault when defendant shot the victim as she fled because there was "no evidence that the detention of the victim was effected in order to accomplish the aggravated assault"); *State v. Joseph Tipler*, No. 02C01-9611-CR-00384, 1998 WL 32683, at *2-3 (Tenn. Crim. App. Jan. 1998) (defendant's act of grabbing the victim by the arm and preventing her escape was not essentially incidental to subsequent aggravated assault committed by threatening victim with a knife). Accordingly, we conclude there was no due process violation.

## CONCLUSION

Because we conclude that there was no error in the admission of the video and that the Defendant's dual convictions are constitutionally permissible, we affirm the judgments of the trial court.

We note that the judgment form for the attempted aggravated kidnapping conviction contains errors. The original judgment form showed that the Defendant was charged with and convicted of aggravated kidnapping, a Class B felony. A corrected judgment was entered, but this form suggested that the Defendant had been charged with aggravated kidnapping and that the offense had been amended to attempted aggravated kidnapping, of which the Defendant was convicted. In addition to incorrectly showing that the offense was amended, the judgment form also incorrectly describes attempted aggravated kidnapping as a Class B felony. We remand for correction of this form.

_____
JOHN EVERETT WILLIAMS, JUDGE